IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2013 Term

**FILED**

**October 17, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 13-0109

IN RE:  J.C.

Appeal from the Circuit Court of Braxton County
Honorable Jack Alsop, Judge
Civil Action No. 12-JA-21

AFFIRMED

Submitted:  September 24, 2013
Filed: October 17, 2013

Bernard R. Mauser, Esq.
Lewisburg, West Virginia
Sutton, West Virginia
Attorney for Petitioner Christina C.


Clinton R. Bischoff, Esq.
Summersville, West Virginia
Guardian *Ad Litem* for J.C.

Patrick Morrisey, Esq.
Attorney General
Charleston, West Virginia
Lee A. Niezgoda, Esq.
Assistant Attorney General
White Hall, West Virginia
Attorneys for Respondent
West Virginia Department of
Health and Human Resources

David Karickhoff, Esq.
Sutton, West Virginia
Attorney for Respondent Allen C.


The opinion of the Court was delivered PER CURIAM.

**SYLLABUS BY THE COURT**

1. "'Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.' Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996)." Syl. Pt. 1, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011).

2. "'When an abuse and neglect petition is brought based solely upon a previous involuntary termination of parental rights to a sibling pursuant to West Virginia Code § 49-6-5b(a)(3) (1998), prior to the lower court's making any disposition regarding the petition, it must allow the development of evidence surrounding the prior involuntary termination(s) and what actions, if any, the parent(s) have taken to remedy the circumstances which led to the prior termination(s).' Syllabus Point 4, *In re George Glen B., Jr.*, 205 W.Va.

i

435, 518 S.E.2d 863 (1999)." Syl. Pt. 4, *In re George Glen B., Jr.*, 207 W.Va. 346, 532 S.E.2d 64 (2000).

3. """"Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, W.Va. Code, 49-6-5 [1977] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under W.Va. Code, 49-6-5(b) [1977] that conditions of neglect or abuse can be substantially corrected.' Syllabus Point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980)." Syllabus point 4, *In re Jonathan P.*, 182 W.Va. 302, 387 S.E.2d 537 (1989).' Syl. Pt. 1, *In re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993)." Syl. Pt. 6, *In re Isaiah A.*, 228 W.Va. 176, 718 S.E.2d 775 (2010).

4. "'[C]ourts are not required to exhaust every speculative possibility of parental improvement . . . where it appears that the welfare of the child will be seriously threatened . . . .' Syl. Pt. 1, in part, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980)." Syl. Pt. 4, in part, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011).

5. "'Where there has been a prior involuntary termination of parental rights to a sibling . . . the legislature has reduced the minimum threshold of evidence necessary for termination where one of the factors outlined in West Virginia Code § 49-6-5b(a) (1998) is

present.' Syllabus Point 2, *In re George Glen B., Jr.*, 205 W.Va. 435, 518 S..E.2d 863

(1999)." Syl. Pt. 3, in part, *In re George Glen B.*, 207 W.Va. 346, 532 S.E.2d 64 (2000).

Per Curiam:

This case is before this Court upon the appeal of the petitioner, Christina C., from the Circuit Court of Braxton County's January 3, 2013, order terminating her parental rights to her child, J.C.[1] The petitioner asserts that the circuit court erred in concluding that the facts and circumstances that gave rise to the abuse and neglect proceedings could not be substantially corrected in the foreseeable future; in denying her a post-adjudicatory improvement period; and in terminating her parental rights. Based upon the record, the parties' briefs, and the arguments presented, we find no error. Accordingly, we affirm both the denial of an improvement period and the termination of the petitioner's parental and custodial rights to J.C.

## I. Factual and Procedural Background

On July 20, 2012, J.C. ("the child"or "J.C.") was born to the petitioner, Christina C. ("the mother"), and her estranged husband,[2] respondent Allen C. ("the father").[3] On July 23, 2012, the respondent, the West Virginia Department of Health and Human

---

[1]Consistent with our practice in cases involving sensitive matters, we use the first name and last initial of the parents and the child victim's initials. *See State v. Edward Charles L.*, 183 W.Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990); *see also R.A.P.* 40(e)(1).

[2]At the time of J.C.'s birth, the parties were separated and remained separated throughout these proceedings. The father testified that although both he and the mother had discussed getting divorced, they "had not come to an agreement."

[3]The termination of the respondent father's parental rights to J.C. was affirmed in a Memorandum Decision issued by this Court on October 1, 2013, in Case No. 13-0393.

Resources ("the Department"), filed a verified Petition to Institute Child Abuse and Neglect Proceedings ("the Petition") in the Circuit Court of Braxton County against the mother and the father. The Petition was based, in part, upon West Virginia Code § 49-6-5b(a)(3) (2009)[4] given the prior involuntary termination of the mother's custodial and parental rights to three other children in 2006.[5] The Petition also alleged that the mother took Suboxone[6] throughout her pregnancy; that she had an extensive history with controlled substances; that the father was aware of her history; and that the mother and the father had a history of domestic violence in the home—the latest incident occurring in March 2012.

On the same day that the Department filed its Petition, the circuit court entered an Initial Order Upon Filing of Petition in which it, *inter alia*, transferred custody of J.C. to

---

[4]West Virginia Code § 49-6-5b provides, in pertinent part, as follows:

> (a) Except as provided in subsection (b) of this section, the department shall file or join in a petition or otherwise seek a ruling in any pending proceeding to terminate parental rights:
>
> • • •
>
> (3) If . . . the parental rights of the parent to a sibling have been terminated involuntarily.

[5]The prior involuntary termination occurred in Webster County, West Virginia. The circuit judge who presided over the instant proceeding in Braxton County was the same judge who presided over the Webster County proceedings initiated in 2005.

[6]While the Department refers to this medication as "suboxin," it is referred to as "Suboxone" in the record, which is the correct name for this medication. Suboxone is used for "maintenance treatment of opioid dependence." *Physicians' Desk Reference*, p. 2223, 67th Edition (2013). Although the mother testified that she was assured that taking this drug throughout her pregnancy would not affect her baby, we note that this drug "is not indicated for use during pregnancy unless potential benefit justifies potential risk." *Id.* at p. 2222.

2

the Department and set the preliminary hearing for July 31, 2012, for the purpose of determining whether conditions existed that required the immediate removal of the child. The Department placed J.C. with foster parents, and he has lived with the same foster parents throughout this proceeding.

The mother waived the preliminary hearing. Thereafter, the circuit court found that due to the prior termination of the mother's parental rights to her three other children, imminent danger existed at the time of the removal of J.C., who was ordered to remain in both the legal and physical custody of the Department.[7] The circuit court set the adjudicatory hearing for August 30, 2012.

During the August 30, 2012, adjudicatory hearing, the mother admitted the allegations in the Department's Petition. She further admitted telling the Department's Child Protective Services ("CPS") worker, Marta Ware, that she was currently prescribed and

---

[7]On September 19, 2013, the guardian ad litem filed a status update with the Court pursuant to Rule 11 of the West Virginia Rules of Appellate Procedure. The guardian reported that J.C. is approximately fourteen months old; that he has remained with the same foster parents since July 23, 2012; that the permanency plan for J.C. remains adoption; and that J.C.'s foster parents seek to adopt him pending the outcome of the instant appeal. The Department also filed a child status update with the Court on September 23, 2013, in which it reported that J.C. has been diagnosed with pulmonary artery stenosis (a narrowing of the arteries which lead from the heart to the lungs); has two holes in his heart; has developed acid reflux; has suffered from chronic ear infections and Respiratory Syncytial Virus (RSV); and has significant developmental delays.

3

taking Suboxone and that she took it throughout her pregnancy.[8] The mother also admitted that she and the father have a history of domestic violence in the home and that the most recent incident occurred in March 2012, while she was pregnant with J.C. It was after this incident that the parties separated.[9] It is undisputed that the mother's parental rights to three other children were involuntarily terminated by the Circuit Court of Webster County in 2006. The circuit court accepted these admissions, adjudicated the mother as an abusive and neglectful parent, and took her motion for a post-adjudicatory improvement period under advisement. The circuit court awarded the mother weekly, two-hour, supervised visits with J.C. The disposition hearing was scheduled for September 19, 2012.

During the disposition hearing, CPS worker Ware testified since the inception of this proceeding, the mother had been compliant with services and had participated in the supervised visitation. Ms. Ware further testified that while the mother had tested positive for Suboxone at the beginning of the case, her drug screens had been negative since approximately August 8, 2012, although she was not undergoing any substance abuse treatment. When questioned regarding the mother's economic situation, Ms. Ware testified

---

[8]A transcript of the adjudicatory hearing is not included in the appendix record; the testimony from the adjudicatory hearing is taken from the parties' appellate briefs.

[9]Although the parties separated and apparently initiated divorce proceedings, the record reflects the father's plan to move next door to the mother in the trailer park where she resides, which was a concern for the guardian ad litem given the parents' history of domestic violence.

that the mother had no income, that she did not think that she was employed, and that she did not know how the mother sustained her household or where she got money for food. Notwithstanding this testimony, and based solely on the mother's participation in services since the initiation of the instant proceedings, Ms. Ware stated that she would "not object to an improvement period[.]"

The record reflects that the circuit court then questioned CPS worker Ware concerning the prior involuntary termination of the mother's rights to three other children, as follows:

> Q. Ma'am, just how much investigation and review of the Webster County case have you done?
> A. Not a lot, sir. I have no copy of the disposition - -
> Q. Well, don't you think that might be an appropriate thing to do?
> A. Yes.
> Q. Because, I mean, I was the trial judge in that case.
> A. Yes.
> Q. And if you look to my order . . . or at the finding of abuse and neglect, the parties[10] were engaged in domestic violence, excessive corporal punishment; the respondent parents were requiring their children to go out and beg for money because they didn't have money to live on. That's the same condition we have here today. They required their children to rear the other children, and as an aside to that, I suspected at the time, subsequent to this Court's finding, one of the individuals that the daughter was being

---

[10]The mother testified that in either 2006 or 2007, she divorced the man who was her husband at the time of the prior termination proceeding.

required to go beg from was sexually assaulting the daughter, and has been criminally convicted of that, as well as the drug use at the time of the dispositional hearing. So how can you come in here and say that you recommend - - when we have the mother in the same situation, she has no income, we don't know how she's living, and that was the same thing that happened in 2005 in Webster County. How do you do that? I mean, how do you not read that [disposition] order?

A.    *Just neglect o[n] my part, Your honor, I'm sorry.*

(Footnote and emphasis added.).

During the disposition hearing, an effort was also made to determine exactly how the mother supported herself. The mother testified that the rent for her mobile home is paid by "Raleigh County Housing" and, as for utilities and other living expenses, she explained that she relies upon the travel reimbursement checks that she receives for medical appointments. In that regard, she testified:

A.    To be honest, the non-emergency medical transportation . . . . Almost anybody would know that you never put that much in your gas tank. You always make really good profit when you go to doctors, and whenever all that extra came, I just kept the checks and I kept piling them up until it's enough to pay the bills.

••••

The Court: Non-emergency - - for whom?

A.    For me. Like when you draw Medicaid, you get reimbursed for the mileage, going to the doctor's, and I was in the Suboxone program, I got reimbursed for that. I was pregnant, seeing the OB/GYN, I got reimbursed for that.

6

When asked whether she had any other source of income, the mother responded that she picked up odd jobs, such as sewing and mowing grass.[11]

The mother was also questioned about her use of Suboxone during her pregnancy with J.C. She testified that it was prescribed for her, explaining that given the "past problems that I've had, I tried my best to look at it in a way to keep me from falling, and I figured the Suboxone would be the best route to take throughout pregnancy to make sure that I wouldn't fall." The mother admitted that she failed to undergo drug treatment that was offered to her in the prior termination proceeding. When asked what she had done to remedy her drug addiction in the approximately seven years since the prior termination proceeding was instituted, the mother cited only her participation in the Suboxone program during her pregnancy with J.C.

In addition to the above, the mother testified that since the prior termination proceeding, she had served a penitentiary sentence following her conviction for selling hydrocodone; that she was released from prison in 2008; that she did not use drugs from 2008, through 2011; and that "the only thing that made [her] start taking again was being a

---

[11]The mother also testified that she had filed for a social security disability based on her "history of migraines . . . the problems with her neck, and the neuropathy." The mother also noted that J.C. would receive benefits based upon the father's social security disability.

patient at the Beckley Pain Clinic" in 2011.[12]  The mother admitted that she had "pain clinic issues back in 2006" during the prior termination proceeding.  She further testified after the institution of the instant proceedings, she ceased taking Suboxone, but added that she had been prescribed Tramadol[13] for "severe pain, severe headaches."

After the testimony concluded at the disposition hearing, the prosecutor stated, as follows:

> Regarding [the mother], I believe the Court knows her history better than anyone here, I suppose, and I'm sure the Court [is] troubled by things that came out during her testimony, including that she was going to a pain clinic in 2011.  She had pain issues in the 2006 case in Webster County.  She admitted she started using drugs in 2011 when she went to the pain clinic.  Then she got on the Suboxone when she became pregnant with her child and all of those are issues that would indicate that until the filing of this petition that probably circumstances haven't changed a whole lot from the 2006 case until now when this petition was filed.

---

[12]As indicated above, the mother testified that she suffers from migraine headaches, neuropathy, and neck issues from a car accident.

[13]Although the mother testified that Tramadol had been prescribed for her by a physician for pain, this is troubling to the Court given her history of abusing drugs and the apparently highly addictive qualities of Tramadol. *See Farmer v. State*, No. 02–09–00278–CR, 2011 WL 1601311 *1 (Tex. App. Apr. 8, 2011) ("Tramadol is the generic name for Ultram[.]"), *vacated on other grounds*, 2011 WL 4072126 (Tex.Crim.App. Sept. 14, 2011); *see also Disciplinary Counsel v. Wolf,* 853 N.E.2d 1169, 1170 (OH 2006) ("Ultram[] [is] a drug that turned out to have highly addictive qualities. . . . reliance on the drug evolved into serious substance abuse . . . .").

8

The circuit judge was clearly concerned about the mother having custody of J.C. while continuing to be unemployed. He described it as "the same condition [as before]- - she sent her children out to beg, she was selling drugs . . . I don't know how she's living. I have my suspicions, but from the evidence, I don't know how she's living." The mother's counsel responded that, in fact, the mother's circumstances had changed because, until her separation from the father in March 2012, she received the financial benefits of his income.[14] The circuit court observed, however, that having the father's disability income was not "substantially different from 2005 or 2006. At that time[,] she had children who had a father who had been . . . murdered, and she was drawing benefits, so it wasn't any different." The circuit court further noted that even with those benefits in the prior proceeding, "which she doesn't have now[,] [s]he was sending kids out to beg. She was selling controlled substances . . . And I don't know how she's supporting herself, much less a child. And that is something I have to be concerned about." The circuit court concluded, as follows:

> [the mother] does not have any income at this particular point in time, and I don't know how she's living in regards to that, but she doesn't have any ability to support a child, she engaged in inappropriate conduct because of lack of income in the prior proceedings, and I do not believe that the conditions out of which the prior abuse and neglect arose which resulted in the termination of parental rights have been substantially corrected, therefore the Court finds that it would be in the best interest of the child that the parental rights of the natural mother are hereby terminated.

---

[14]The father testified that his income consisted of $700 per month in disability payments.

9

In its January 3, 2013, dispositional order, the circuit court took judicial notice of the mother's prior involuntary termination of parental rights and found that the mother had been "non compliant" with the court-ordered substance abuse treatment in that case; that she engaged in acts of domestic violence with her then husband; that she subjected her children to inappropriate conduct, such as making them beg for money so she could purchase illegal substances; and that she was convicted of selling hydrocodone. With regard to the mother's recent situation, the circuit court further found, *inter alia*, as follows:

> 3. The respondent mother has shown some improvement but she has had no significant substance abuse counseling. She was attending a pain clinic in 2011.

> 4. Further, the respondent mother has no income and no ability to support the child. This was an issue during her previous case and remains a problem that has not been substantially corrected.

The circuit court ruled that the "mother's parental and custodial rights to the child are hereby permanently terminated as there is no likelihood that the conditions of abuse and neglect has [sic] been or can be substantially corrected in the reasonable future." This appeal followed.

## II. Standard of Review

We are asked to review a circuit court's order entered upon a petition for termination of parental rights. Our standard of review in this regard is well established:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and

10

neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011). As we explained in *State ex rel. Diva P. v. Kaufman*, 200 W.Va. 555, 490 S.E.2d 642 (1997), "the above standard of review requires deference by this Court to the findings of a circuit court in a civil abuse and neglect proceeding. The critical nature of unreviewable intangibles justify the deferential approach we accord findings by a circuit court." *Id.* at 562, 490 S.E.2d at 649. Furthermore, "a circuit court's substantive determinations in abuse and neglect cases on adjudicative and dispositional matters—such as whether neglect or abuse is proven, or whether termination is necessary—is entitled to substantial deference in the appellate context." *In re Rebecca K.C.*, 213 W.Va. 230, 235, 579 S.E.2d 718, 723 (2003) (internal citations omitted). With these standards in mind, the parties' arguments will be considered.

**III. Discussion**

11

In the present appeal, the mother asserts that the circuit court's denial of her request for a post-adjudicatory improvement period and its termination of her parental rights are not supported by the evidence. More specifically, she argues that West Virginia Code § 49-6-5(a)(6) (2009 & Supp. 2013) requires a finding that there is no reasonable likelihood that the conditions of abuse or neglect can be substantially corrected in the near future and that none of the "conditions," as set forth in West Virginia Code § 49-6-5(b)(1) through (7), are present in this case.[15] The mother further argues that there was no bar to awarding her an improvement period and that the circuit court erroneously concluded that her circumstances had not changed since the prior termination of her parental rights to her three other children. The mother contends that her incarceration for selling hydrocodone "surely

---

[15]West Virginia Code § 49-6-5(b) (2009) provides, in pertinent part, as follows:

> (B) As used in this section, "no reasonable likelihood that conditions of neglect or abuse can be substantially corrected" shall mean that, based upon the evidence before the court, the abusing adult or adults have demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help. Such conditions shall be considered to exist in the following circumstances, *which shall not be exclusive*:
>
> (1) The abusing parent or parents have habitually abused or are addicted to alcohol, controlled substances or drugs, to the extent that proper parenting skills have been seriously impaired and such person or persons have not responded to or followed through the recommended and appropriate treatment which could have improved the capacity for adequate parental functioning[.]

*Id.* (emphasis added).

12

would have had some rehabilitative benefits," and that she, contrary to the circuit court's findings, has income through odd jobs, in addition to the mileage reimbursement payments discussed above.[16] Lastly, the mother contends that the circuit court failed to adhere to the evidentiary threshold set forth in *In Re: Rebecca K.C.*, 213 W.Va. 230, 579 S.E.2d 718, wherein the Court stated that "regardless of past events, unless the evidence is clear and convincing to the effect that an improvement period would be pointless, our law requires that one must be ordered." *Id.* at 235, 579 S.E.2d at 723.

For his part, the guardian ad litem argues in favor of affirming the circuit court's decision to deny a post-adjudicatory improvement period and to terminate the mother's parental rights to J.C. The guardian asserts that the facts, circumstances, and other conditions that gave rise to the prior termination of the mother's parental rights have neither been addressed nor corrected by the mother, thus warranting a termination of her parental

_____

[16]The mother also testified that she had applied for disability benefits.

rights in the instant proceeding.[17]   During oral argument, the guardian stated that J.C.'s

placement with his foster parents has been in his best interest.

> We begin our analysis of these issues by acknowledging that
>
> > "[a]lthough parents have substantial rights that must be
> > protected, the primary goal in cases involving abuse and neglect,
> > as in all family law matters, must be the health and welfare of
> > the children."  Syl. Pt. 3, *In re Katie S.*, 198 W.Va. 79, 479
> > S.E.2d 589 (1996).  Indeed, ""'[i]n a contest involving the
> > custody of an infant the welfare of the child is the polar star by
> > which the discretion of the court will be guided."  Syl. pt. 1,
> > *State ex rel. Cash v. Lively,* 155 W.Va. 801, 187 S.E.2d 601
> > (1972).'  Syllabus Point 4, *State ex rel. David Allen B. v.
> > Sommerville*, 194 W.Va. 86, 459 S.E.2d 363 (1995)."  Syl. Pt.
> > 2, *In the Interest of Kaitlyn P.*, at 123-124, 690 S.E.2d at 131-
> > 132.

*In re Timber M.,* 231 W.Va. 44, __, 743 S.E.2d 352, 361 (2013).  Inasmuch as the case at

bar involves the prior termination of parental rights, we further observe that

> > "[w]hen an abuse and neglect petition is brought based solely
> > upon a previous involuntary termination of parental rights to a
> > sibling pursuant to West Virginia Code § 49-6-5b(a)(3) (1998),
> > prior to the lower court's making any disposition regarding the

---

[17]While the guardian ad litem's position has remained constant in this matter, the Department's position has vacillated.  During the disposition hearing, the Department had no objection to the mother being awarded an improvement period given her participation and sobriety during the pendency of the case which, at that time, was less than two months.  In its one and a half page summary response filed with this Court in lieu of an appellate brief, the Department stated that while it did not object to the mother's request for an improvement period, it was now concerned about J.C.'s permanency.  Then, in the Department's status update filed during the pendency of this appeal, it states that J.C.'s adoption by his foster parents is now in his best interest because he is a medically fragile, fourteen-month-old child who has lived with his foster parents since he was three days old.

petition, it must allow the development of evidence surrounding the prior involuntary termination(s) and what actions, if any, the parent(s) have taken to remedy the circumstances which led to the prior termination(s)." Syllabus Point 4, *In re George Glen B.*, Jr., 205 W.Va. 435, 518 S.E.2d 863 (1999).

Syl. Pt. 4, *In re George Glen B., Jr.*, 207 W.Va. 346, 532 S.E.2d 64 (2000). Importantly, when there has been a prior termination of parental rights, the Department is *not* required to make reasonable efforts to preserve the family:

> (7) For purposes of the court's consideration of the disposition custody of a child pursuant to the provisions of this subsection, the department is *not* required to make reasonable efforts to preserve the family if the court determines:
>
> (A) The parent has subjected the child, *another child of the parent . . .* to aggravated circumstances which include, but are not limited to, abandonment, torture, chronic abuse and sexual abuse;
> ••••
> (C) The parental rights of the parent to another child have been terminated involuntarily.

W. Va. Code § 49-6-5(a)(7)(A) & (C) (emphasis added).

Here, the evidence surrounding the prior involuntary termination was developed through the adjudicatory and dispositional hearings held before the circuit court.[18]

---

[18]As previously discussed, the record reveals that the Department was woefully unprepared to address the circumstances that led to the prior involuntary termination of the mother's parental rights to her three other children, even though the prior termination was one of the primary bases for the Department instituting the current proceeding. Simply stated, it was imperative that the Department thoroughly review the circumstances of the prior proceeding so that it could make a reasoned and informed recommendation in the current matter. Regrettably, it did not.

15

The mother argues that her prior involuntary termination does not mean that she does not have the right to prove herself in an improvement period. However, the decision as to whether to award an improvement period is discretionary with the lower court "based upon all of the evidence, *including evidence from any prior abuse and neglect cases*[.]" *In re Rebecca K.C.,* at 235, 579 S.E.2d at 723 (emphasis added). Indeed, the Legislature has expressly stated that improvement periods are *not* mandatory and are granted at the circuit court's discretion. W.Va. Code § 49-6-12 (2009 & Supp. 2013). Furthermore, as we explained in *State ex rel. Virginia M. v. Virgil Eugene S. II*, 197 W.Va. 456, 475 S.E.2d 548 (1996):

> West Virginia Code § 49-6-12 (1996) . . . now *requires a parent* seeking an improvement period in cases of neglect or abuse *to file a written motion* requesting it, *and to demonstrate by clear and convincing evidence that he or she is likely to fully participate in the improvement period*. Thus rather than presuming the entitlement of a parent to an improvement period . . . the law now places on the parent the burden of proof regarding whether an improvement period is appropriate.

*Id.* at 461 n.9, 475 S.E.2d at 553 n.9 (emphasis added). Here, the mother's request for an improvement period fails in two ways. First, although she indicates in her appellate brief that she "moved" for an improvement period at the adjudicatory hearing, she does not state nor does the record reflect that she filed a written motion for an improvement period as required by West Virginia Code § 49-6-12. Second, she failed in her burden of proof. After holding two evidentiary hearings, the circuit court found that the conditions out of which the prior abuse and neglect arose have not been substantially corrected by the mother. The circuit

16

court specifically expressed concern regarding the mother's continued lack of income. As discussed above, the circuit court noted that in the prior termination proceeding, the mother's lack of income resulted in her requiring her children to beg for money, which, in turn, led to the sexual assault of her daughter. Further, the circuit court was not convinced that the mother's abuse of drugs had been resolved. *See In re Faith C.*, 226 W.Va. 188, 195, 699 S.E.2d 730, 737 (2010) (quoting, in part, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996) (we have previously stated that "due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses."). The circuit court was appropriately concerned given the mother's admission that she started "taking again" after going to a pain clinic in 2011, particularly when she had pain clinic issues in the prior termination proceeding. Moreover, although Suboxone was prescribed for her to take during her pregnancy with J.C., the very fact that she was prescribed this medication demonstrates that she had *not* resolved her drug issues since the prior termination proceeding.[19]

The circuit court recognized the mother's clean drug screens and compliance with the Department's services in the weeks leading up to the dispositional hearing when it stated in its disposition order that the mother had "shown some improvement[.]" However, the circuit court also correctly concluded that the mother was "non compliant" with the court-ordered substance abuse treatment in the prior termination proceeding and, that in the years

---

[19]*See supra* n.6.

17

since the prior termination, not only had she failed to undergo any "significant substance abuse counseling[,]" she had been convicted of selling hydrocodone and began attending a pain clinic in 2011. Under these circumstances, a few weeks of clean drug screens and compliance with the Department's services fail to sustain the mother's burden of proving by clear and convincing evidence that she was entitled to a post-adjudicatory improvement period. Accordingly, we conclude that the circuit court acted within its discretion in denying an improvement period in this matter.

Similarly, we also agree with the circuit court's conclusion that the mother's failure to substantially resolve the problems that led to the prior involuntary termination of parental rights warrant a termination of her parental rights in the present proceeding. As we have previously explained,

> "'Termination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, W.Va. Code, 49-6-5 [1977] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under W.Va. Code, 49-6-5(b) [1977] that conditions of neglect or abuse can be substantially corrected." Syllabus Point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).' Syllabus point 4, *In re Jonathan P.*, 182 W.Va. 302, 387 S.E.2d 537 (1989)." Syl. Pt. 1, *In re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993).

Syl. Pt. 6, *In re Isaiah A.*, 228 W.Va. 176, 718 S.E.2d 775 (2010). Here, the circuit court found that there is no likelihood that the conditions of abuse and neglect have been or can be "substantially corrected in the reasonable future." Based on this Court's review of the

18

record, which demonstrates that the mother has failed to resolve these conditions in the several years since the prior involuntary termination, we agree.

We have held that "'courts are not required to exhaust every speculative possibility of parental improvement . . . where it appears that the welfare of the child will be seriously threatened . . . .' Syl. Pt. 1, in part, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980)." Syl. Pt. 4, in part, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873 (2011). In this case, the mother had approximately seven years to resolve the problems that led to the prior involuntary termination of her parental rights and she clearly failed to do so. Instead, she continued to engage in domestic violence; continued to have drug problems, including a drug-related incarceration; continued to fail to participate in any significant substance abuse counseling; and continued to have no regular income.[20] Moreover, this evidence must be examined under a reduced minimum threshold given the mother's prior involuntary termination. *See* Syl. Pt. 3, *In re George Glen B., Jr.*, 207 W.Va. 346, 532 S.E.2d 64.

On appeal, this Court "must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In re Cecil T.*, 228 W.Va. 89, 717 S.E.2d 873. Given the substantial deference owed the circuit court's

---

[20]Again, as the circuit court observed, the father's disability income was not substantially different from the prior termination where the mother's children were receiving benefits, yet she still required them to beg for money. Further, we agree with the circuit court that the mother's travel reimbursement checks for medical appointments are an unreliable source of income to sustain her, let alone a child.

decision,[21] as well as our examination of the evidence under a lower minimum threshold, and being guided by the polar star of the child's welfare,[22] we find no error in the circuit court's termination of the mother's parental rights to J.C.

## IV.  Conclusion

For the foregoing reasons, we find no error in either the Circuit Court of Braxton County's denial of the mother's request for a post-adjudicatory improvement period or in its termination of the mother's parental rights to her child, J.C.  Accordingly, the circuit court's order entered January 3, 2013, is hereby affirmed.

Affirmed.

---

[21]*See In re Rebecca K.C.*, 213 W.Va. 230, 235, 579 S.E.2d 718, 723.

[22]*See In re Timber M.*, at __, 743 S.E.2d at 361.