IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2023 Term

_____

No. 22-0464

_____

IN RE: H.D.

**FILED**

**June 2, 2023**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

_____

Appeal from the Circuit Court of Nicholas County
The Honorable Stephen O. Callaghan, Judge
Case No. 21-JA-73

AFFIRMED
_____

Submitted: March 29, 2023
Filed: June 2, 2023

Juston H. Moore, Esq.
Juston H. Moore, PLLC
Wayne, West Virginia
Counsel for Petitioner

Patrick Morrisey, Esq.
Attorney General
Andrew T. Waight, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Respondent Department of
Health and Human Resources

Carin Kramer, Esq.
Law Office of Carin Kramer
Lewisburg, West Virginia
Guardian *Ad Litem*

Robert B. Kuenzel, Esq.
Kuenzel Law, PLLC
Chapmanville, West Virginia
Counsel for Intervenors

JUSTICE ARMSTEAD delivered the Opinion of the Court.

CHIEF JUSTICE WALKER and JUSTICE WOOTON dissent and reserve the right to file dissenting Opinions.

**SYLLABUS BY THE COURT**

1. "West Virginia Code § 49-4-610(6) (eff. 2015) authorizes only *one* extension of a post-adjudicatory improvement period." Syl. Pt. 5, *State ex rel. P.G.-1 v. Wilson*, 247 W. Va. 235, 878 S.E.2d 730 (2021).

2. "'[C]ourts are not required to exhaust every speculative possibility of parental improvement . . . where it appears that the welfare of the child will be seriously threatened, and this is particularly applicable to children under the age of three years who are more susceptible to illness, need consistent close interaction with fully committed adults, and are likely to have their emotional and physical development retarded by numerous placements.' Syl. Pt. 1, in part, *In re R.J.M.,* 164 W.Va. 496, 266 S.E.2d 114 (1980)." Syl. Pt. 4, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

**Armstead, Justice:**

The Circuit Court of Nicholas County terminated the parental and custodial rights of Petitioner, A.T., due to her substance abuse problem. On appeal, A.T. objects arguing she substantially complied with the terms of her post-adjudicatory improvement period and that her tuberculosis infection prevented her from entering a long-term drug rehabilitation facility in a more timely manner. After review, we find that the circuit court did not err when it terminated A.T.'s parental and custodial rights or when it declined to extend her improvement period or grant an additional, post-dispositional improvement period. Therefore, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

A.T. gave birth to a daughter, H.D., in June 2021.[1] Both A.T. and H.D. tested positive for methamphetamine, and in July 2021 the Department of Health and Human Resources (the "DHHR") filed an abuse and neglect petition against A.T. H.D.'s father, R.D., was deemed a non-offending parent and retained custody of the child. However, H.D. went to live with her maternal grandparents, so A.T. could remain at home with R.D.

A.T. admitted the petition's allegations in August 2021, was adjudicated as an abusive and neglectful parent, and received a 90-day post-adjudicatory improvement period. As a special condition, the circuit court ordered A.T. to complete a "long term drug

---

[1] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e) [eff. 2022].

1

rehabilitation program." Though H.D. remained in her father's custody, visitation by A.T. was to be at the discretion of the DHHR and the child's guardian *ad litem*.

Around the time of the birth, A.T. learned that she had tested positive for tuberculosis, and the record shows that on September 21, 2021, FMRS Health Systems, Inc., ("FMRS") issued a letter to a Child Protective Services ("CPS") worker advising that FMRS would need "all records" for A.T.'s tuberculosis diagnosis and treatment and that its Turning Pointe rehabilitation facility could not admit A.T. while she had an "active" tuberculosis infection. In October 2021, the court received a letter from the Nicholas County Health Department stating that A.T. was "under care with the WV State TB Elimination Program" and that the health department was "responsible for treatment, medication administration[,] and monitoring during this period."

The DHHR's October 2021 court report noted that A.T. had "passed" all her drug screens at the day report center and had a prescription for Buprenorphine,[2] that A.T. was set to begin outpatient therapy later that month, and that A.T. was being treated for tuberculosis through the health department. As for the court's special condition that A.T. attend long-term rehabilitation, A.T. professed that she was "not opposed to rehab" and would "go when she can." However, she claimed that, due to her tuberculosis diagnosis, no "rehab" facility would accept her and that she was "a risk for any facility." Nevertheless, the report also advised that A.T. had refused to share medical information.

---

[2] Because A.T. had a prescription for Buprenorphine, a test result was considered negative if it found no other illicit substance.

2

A.T. argued that she had provided a letter from the health department and stated, "That's all you need." A.T.'s attorney instructed her to provide "all" her medical records.

That month, A.T. underwent a psychological evaluation. The resulting report provided A.T.'s account of how she ingested methamphetamine before the birth of H.D. According to A.T., she thought she was ingesting crushed Subutex, and the report describes A.T.'s lengthy history of illegal substance abuse. According to the report, A.T. admitted testing positive for "nanograms of amphetamine or methamphetamine" and professed confidence in her ability to abstain from drug abuse: "I'm sure everybody says that, but I think it would take something really, really bad to even make me have the thought. Nothing's worth it." Nevertheless, the report concluded that A.T.'s prognosis was "guarded" and "contingent on her ability to abstain from drug use."

At a review hearing in November 2021, the assistant prosecuting attorney reported that he had reviewed several medical records and that "rehabilitation facilities will not take [A.T.]" He stated, "[S]he does have tuberculosis. She's doing a *six-month* treatment, which this was diagnosed in July; so there will be no long-term place that will take her because of the health problems she has." (Emphasis added.) At the prosecutor's request, the circuit court extended A.T.'s improvement period for an indeterminate period and ordered A.T. to attend an approved long-term rehabilitation program if she was "eligible."

The DHHR's January 2022 court report noted that A.T. had "passed" all screens at the day report center. A.T. reported that she was still being treated for

3

tuberculosis and maintained that she could not enter a rehabilitation facility. However, despite this claim, the court report states that A.T. had yet to sign a release for her infectious disease doctor's records and that she objected when a CPS worker requested records from the outpatient treatment program where A.T. had been screening. When the DHHR issued the January 2022 court report, A.T. had been diagnosed with tuberculosis for more than six months.

Issues related to A.T.'s medical records were discussed at the January 2022 review hearing later that month. The guardian *ad litem* stated, "We have no medical records . . . [and] don't know why . . . [A.T.] cannot go into rehab." A CPS worker clarified that the DHHR had hospital records from H.D.'s birth (and A.T.'s related hospitalization) and "some" records from the outpatient treatment program. However, the DHHR lacked releases for A.T.'s infectious disease doctor. A.T.'s attorney insisted that A.T. had signed releases and that they had been trying to obtain records without cooperation from the "medical folks." He asked the circuit court to extend A.T.'s improvement period a second time, arguing that the "issue of the rehab" would eventually "come to a head" and that "[e]ither we'll have sufficient medical documentation, or we'll have to . . . make a decision in light of that." The circuit court reminded the parties that long-term rehabilitation was the "biggest part" of the improvement period and found that it was A.T.'s responsibility to "track down" the relevant medical documentation. Under the circumstances, the court found that A.T. had neither complied with the court's order nor provided "any good cause" for her non-compliance.

4

The DHHR's February 2022 court report advised that A.T. continued to produce negative screens at the day report center and that she was medically cleared to begin rehabilitation. Yet, according to the report, A.T. still refused to provide medical releases and "ha[d] not been compliant with the Department."

On March 23, 2022, law enforcement arrested H.D.'s father, R.D., on an outstanding warrant. Two days later, the DHHR filed an amended petition alleging that R.D. had attempted to "outrun" law enforcement with H.D. in his vehicle and that, when he was arrested, R.D. had a vial of methamphetamine on his person.

Although the amended petition leveled no new allegations against A.T., the DHHR's April 2022 court report revealed that *A.T. was also present in the vehicle* and that, afterward, A.T. tested positive for methamphetamine for two consecutive days. According to the report, A.T. had been living with R.D. and H.D. off and on while A.T.'s case was pending and not just on agreed visitation days. As of the date of the report, A.T. was in a 60-day rehabilitation program, which she maintains she mistakenly believed qualified as long-term rehabilitation.

The DHHR recommended revoking A.T.'s improvement period, and later that month, the court held a hearing to determine whether to terminate her improvement period. A CPS worker testified that, although A.T. was "cleared" to enter long-term rehabilitation in early February,[3] later that month A.T. had been turned away from a long-

_____

[3] We note that, according to the worker, this testimony was based on "documentation" from the health department and A.T.'s doctor.

term rehabilitation program because she denied having a drug problem. The worker opined that A.T. could not address her problems in the near future without long-term rehabilitation and that A.T. could not complete long-term rehabilitation "within the time frames[.]" On cross-examination, the worker testified that, before A.T. was released from tuberculosis treatment, she "could have" qualified for a particular long-term rehabilitation program by submitting to "a couple of initial tests." Yet, according to the worker, A.T. did not submit to the tests.

A.T. also testified at the April 2022 hearing. She described her course of tuberculosis treatment and said that she had phoned "multiple" rehabilitation facilities, only to be advised that she would not qualify due to "no recent use" of drugs, her tuberculosis infection, or both. She confessed, "I am an addict[,]" and though she testified that the "sole purpose" of the 60-day program was to "get off the Suboxone[,]" she also agreed that she was in the 60-day program because she had "a meth problem." She agreed, further, that H.D. was in the vehicle when law enforcement seized R.D, stating,

> We had picked [H.D.] up, and we were on our way back to our house, . . . and we had gotten gas, and I was in the backseat with [H.D.] . . .
>
> We . . . turned around at the gas pump, just going to pull out, and, when we did so, a blue truck was just in front of us . . . [that] hit our car, blue lights came on. There was a lot of screaming. They tried to bust out the front passenger window. I had leaned over at this point and was covering [H.D.] with my body, screaming, "I have a baby. I have a baby," and they—they backed off on that side, and they came—they had ran [sic] up to the driver's side. [R.D.]'s window was down. They opened the door. They pulled him out, and I . . . couldn't understand anything that was being said, there were so many

voices and flashlights and guns, and I wasn't sure where to look. I was told not to look out the window, so I tried to keep [H.D.] calm and keep her looking at me, and just hope that she didn't realize that anything was going on.

As for her positive screens for methamphetamine, she explained that "I made a very poor choice, and I relapsed. I had what felt like the weight of the world on my shoulders[.]" On cross-examination, she testified that she had been cleared to begin long-term rehabilitation in early February 2022 and that she was turned away from a long-term rehabilitation program later that month because she refused to say that she was misusing her Suboxone and because, at that point, she did not believe she had a problem with methamphetamine. On subsequent cross-examination, she explained, "I hadn't used in so long at that point . . . I did not consider it a problem, or I was in denial." Nevertheless, she testified that she had used methamphetamine the day before the arrest and agreed that she was "under the influence of meth with the baby in the car[.]" She also testified that she had purchased the methamphetamine in a transaction that began at the courthouse:

> Q    Tell us how you arranged the deal.
> A    I saw her [i.e., the dealer].
> Q    Where at?
>      . . . .
> A    Right here on the corner at the courthouse. . . .
> Q    And then what—how did the deal arrange?
> A    She asked me how I'd been, . . . told me I should stop
> by, and I was dumb enough to do it. . . .
>      . . . .
> Q    How much did you buy?
> A    $20 worth.

7

She later explained that methamphetamine is "just the easiest to get" and agreed that this ease of access was a "problem" for her. After hearing argument, the circuit court revoked A.T.'s improvement period and set the matter for disposition. By that point, A.T.'s improvement-period *extension* had been in place for five months, and the DHHR's original petition had been pending for nine months.

The next day, A.T. entered a nine-month residential rehabilitation program. She later filed a written motion for a post-dispositional improvement period, arguing that her entrance into the program was a substantial change in circumstance that made it likely she would fully participate in what would have been her second improvement period.

The DHHR's May 2022 court report noted that A.T. was "progressing well" in the program and recommended that A.T.'s motion for a post-dispositional improvement period be granted. The guardian *ad litem* recommended the same, despite concluding that A.T. "has not been compliant with the terms and conditions of her improvement period until recently[,]" that A.T. "has a serious substance use disorder that she has failed to address until now[,]" and that A.T. "was evasive with the [multi-disciplinary team] regarding her medical records and was improperly exercising visitation with the child."

In May 2022, the circuit court held a dispositional hearing and repeated its January 2022 findings that A.T. had failed to comply with the court's order to enter long-term rehabilitation and had failed to "show good cause" for her failure to do so. Those matters were deemed "settled." A CPS worker testified that A.T. had shown "minimal compliance" by attending the 60-day program and beginning the nine-month program;

8

however, the worker explained that this "was the main thing that we needed her to do, so I did recommend an improvement period." Nevertheless, the worker did not believe that it was in H.D.'s best interests to be reunited with A.T. at that time, stating A.T. "has not completed the . . . rehabilitation program with recent failed meth screens" and that the worker could not "speculate what would happen in nine months[.]" The worker emphasized, however, that she was recommending an improvement period "[s]olely because [A.T.] went to rehab." On further questioning, the worker agreed that it was in the child's best interests to "see how [A.T.] does in rehab[.]" The guardian *ad litem* joined the DHHR's recommendation, stating that, "if there's any possibility of reunification, I would like to see that happen[.]" A.T. did not testify at the dispositional hearing or offer any other witnesses.

The circuit court denied A.T.'s motion for a post-dispositional improvement period and terminated A.T.'s parental and custodial rights. In its dispositional order, the circuit court found, among other things, that A.T. had admitted to using methamphetamine during her pregnancy, that she was ordered to enter long-term rehabilitation in August 2021, and that long-term rehabilitation was the "most critical" condition of her improvement period. The circuit court further found that A.T. did not enter a long-term rehabilitation program until April 12, 2022, and failed to "show good cause" for why she had not entered such long-term rehabilitation before then. With regard to A.T.'s substance abuse, the circuit court found that A.T. tested positive for methamphetamine on March 24 and 25, 2022, and was "high on methamphetamine," with the child in the car, when R.D.

9

was arrested in March 2022. Finally, the circuit court found that A.T. was denied admission to a suitable long-term rehabilitation program because she denied that she was addicted to drugs "at a time when she clearly was." Due to these findings, the court determined by clear and convincing evidence that A.T. was "unable to correct the conditions of abuse and neglect (methamphetamine abuse) even with . . . assistance" from the DHHR, that she was "unable to correct her addiction in the near future[,]" and that she was not likely to "fully participate" in a post-dispositional improvement period. Accordingly, the court determined that it was not in H.D.'s best interest to delay permanency to "monitor" whether A.T. could address her "long-term and severe substance abuse problem after she refused treatment for eight months[.]" A.T. appeals from the circuit court's May 17, 2022 dispositional order.

## II. STANDARD OF REVIEW

On appeal from a dispositional order, we defer "to the circuit court's factual findings and conduct an independent review of questions of law[.]" *In re S.C.*, 245 W. Va. 677, 686, 865 S.E.2d 79, 88 (2021). Indeed, we have stated that, in abuse and neglect matters, a circuit court's findings of fact may "not be set aside . . . unless clearly erroneous" and that a finding is not "clearly erroneous" unless, "although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Syl. Pt. 1, in part, *In Int. of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996). This deference extends to "substantive determinations" on "dispositional matters—such as . . . whether termination is

necessary"—*In re Rebecca K.C.*, 213 W. Va. 230, 235, 579 S.E.2d 718, 723 (2003) (per curiam), because "we recognize[] that 'the circuit court is the better-equipped tribunal' to make" such decisions, *id.* at 233, 579 S.E.2d at 721 (quoting *In re Emily*, 208 W. Va. 325, 340, 540 S.E.2d 542, 557 (2000)). "[C]ritical" yet "unreviewable intangibles[,]" *In re J.C.*, 232 W. Va. 81, 87, 750 S.E.2d 634, 640 (2013) (per curiam) (quoting *State ex rel. Diva P. v. Kaufman*, 200 W. Va. 555, 562, 490 S.E.2d 642, 649 (1997)), may escape our notice "from a vista of a cold appellate record[,]" *State v. Potter*, 197 W. Va. 734, 751, 478 S.E.2d 742, 759 (1996); therefore, we refuse to "overturn a finding simply because [we] would have decided the case differently," *Tiffany Marie S.*, 196 W. Va. at 226, 470 S.E.2d at 180, syl. pt. 1, in part. On the contrary, our duty is to "affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." *Id.* Guided by this standard, we now consider A.T.'s appeal.

### III. ANALYSIS

A.T. advances three assignments of error. First, she alleges that the circuit court erred by refusing to extend her post-adjudicatory improvement period. Second, she maintains that the circuit court erred by denying her motion for a post-dispositional improvement period. Finally, she states that the circuit court erred by terminating her parental rights. Despite their recommendations below, the DHHR and the guardian *ad litem* ask us to affirm the circuit court on every assignment of error. The intervening foster parents urge us to do the same. We will consider each assignment of error in turn.

### A. Refusal to Extend Post-Adjudicatory Improvement Period.

A.T. claims that the circuit court should have extended her post-adjudicatory improvement period because she substantially complied with the terms of her improvement period and because extending the improvement period was consistent with H.D.'s best interest and would not have impaired the DHHR's ability to place H.D. in a permanent setting.[4] A.T. supports her claim by citing the record of her allegedly substantial compliance, and she maintains that, in April 2022, she had one month of "possible time" left on her post-adjudicatory improvement period.

A.T. reaches this one-month figure by adding (a) the maximum time allowed for an initial post-adjudicatory improvement period (i.e., six months)[5] plus (b) the maximum time allowed for a post-adjudicatory improvement period extension (i.e., three months)[6] to reach a maximum post-adjudicatory improvement period of nine months. This reasoning, however, ignores both the relevant law and the facts of this case.

West Virginia Code § 49-4-610(2) (eff. 2015) does not provide for an initial post-adjudicatory improvement period whose length is six months *automatically*; what it

---

[4] *See* W. Va. Code § 49-4-610(6) (authorizing an improvement period extension "when the court finds that the respondent has substantially complied with the terms of the improvement period; that the continuation of the improvement period will not substantially impair the ability of the department to permanently place the child; and that the extension is otherwise consistent with the best interest of the child").

[5] *See* W. Va. Code § 49-4-610(2) (authorizing an initial post-adjudicatory "improvement period of a period not to exceed six months").

[6] *See* W. Va. Code § 49-4-610(6) (authorizing an extension "for a period not to exceed three months").

provides is that a circuit court "may grant" an initial post-adjudicatory improvement period "*not to exceed* six months[.]" *Id.* (emphasis added). More to the point, although West Virginia Code § 49-4-610(6) provides that "[a] court may extend" a post-adjudicatory improvement period, the statute only permits an extension "for [1] *a period* [2] *not to exceed* three months[.]" *Id.* (emphasis added). Hence, we have held that "West Virginia Code § 49-4-610(6) (eff. 2015) authorizes only *one* extension of a post-adjudicatory improvement period[,]" Syl. Pt. 5, *State ex rel. P.G.-1 v. Wilson*, 247 W. Va. 235, 878 S.E.2d 730 (2021), and that this "extension must be for a period that does not exceed three months[,]" *id.* at ___, 878 S.E.2d at 733, syl. pt. 6, in part.

These statutory limits pose a problem for A.T. In this case, the circuit court granted A.T. a post-adjudicatory improvement period of 90 days in August 2021, which meant that her initial improvement period expired in November 2021. When the circuit court extended A.T.'s improvement period in November 2021, though the circuit court did not set a time limit on the extension, that extension could not lawfully continue for longer than three months (i.e., until February 2022) and could not be followed by an additional extension of any length. Thus, in April 2022, the circuit court could not lawfully extend A.T.'s post-adjudicatory improvement period for any additional length of time or for any reason. Because the circuit court could not lawfully grant A.T.'s motion to extend her post-adjudicatory improvement period, it was not error for the circuit court to refuse to do so.

### B. Denial of Post-Dispositional Improvement Period.

A.T. argues that the circuit court also erred when it denied her motion for a post-dispositional improvement period. She contends that her eleventh-hour participation in long-term rehabilitation was a substantial change in circumstances that, when combined with her prior record of compliance, proved that she was "fully likely" to participate in a second improvement period. She claims that her failure to participate in long-term rehabilitation was her "only" failing and that, even then, her tuberculosis diagnosis provided a "valid medical excuse" for such failure. We are not convinced.

When a parent has received a post-adjudicatory improvement period, West Virginia Code § 49-4-610(3)(D) authorizes a second, post-dispositional improvement period only if the parent demonstrates, first, "that since the initial improvement period, the [parent] has experienced a substantial change in circumstances" and, second, "that due to that change in circumstances, the [parent] is likely to fully participate in the improvement period[.]"[7]

However, no "parent charged with abuse and/or neglect is . . . unconditionally entitled to an improvement period." *In re Charity H.*, 215 W. Va. 208, 216, 599 S.E.2d 631, 639 (2004) (per curiam). On the contrary, "West Virginia law allows

---

[7] We note that, by statute, a post-dispositional improvement period functions as an "alternative disposition" for purposes of West Virginia Code § 49-4-604(e). *See id.* (providing that a "court may, as an alternative disposition, allow the parents or custodians an improvement period not to exceed six months"); W. Va. Code § 49-4-610(3) (authorizing a court to grant a post-dispositional "improvement period not to exceed six months as a disposition pursuant to section six hundred four of this article").

14

the circuit court *discretion* in deciding whether to grant a parent an improvement period[,]" and the parent, not the DHHR, "bear[s] the burden at the disposition stage to show that [she] should be granted the opportunity to remedy the circumstances that led to the filing of the abuse and neglect petition." *In re M.M.*, 236 W. Va. 108, 115, 778 S.E.2d 338, 345 (2015) (emphasis added). If "a parent cannot *demonstrate* that he/she will be able to correct the conditions of abuse and/or neglect with which he/she has been charged, an improvement period need not be awarded[.]" *State ex rel. W. Va. Dep't of Health & Hum. Res. v. Dyer*, 242 W. Va. 505, 516, 836 S.E.2d 472, 483 (2019) (emphasis added) (quoting *In re Emily*, 208 W. Va. at 336, 540 S.E.2d at 553).

In this case, the circuit court focused its analysis on the second statutory requirement and found that A.T. was not "likely to fully participate" in a post-dispositional improvement period. W. Va. Code § 49-4-610(3)(D). Although A.T. claims that this finding was error, we note that the circuit court's underlying findings of fact are essentially uncontested. When A.T. admitted the allegations in the petition, she admitted to using methamphetamine during her pregnancy, and she confirmed this admission in her statements to the psychological evaluator. Given this history, it was entirely appropriate for the circuit court to make long-term rehabilitation a special condition of A.T.'s improvement period, and there was little doubt that this was the most important term of her improvement period, which was granted in August 2021. Additionally, there is no dispute that, despite this requirement, A.T. tested positive for methamphetamine on March 24, 2022, and March 25, 2022, or that A.T. did not enter long-term rehabilitation until April

15

12, 2022. A.T., herself, agreed that she was "under the influence of meth" when R.D. was arrested in March 2022 and that H.D. was present in the vehicle at the time. A.T. testified, further, that she was denied admission to a long-term rehabilitation program in February 2022 because she "did not consider it [i.e., her methamphetamine addiction] a problem[] or . . . was in denial." Yet A.T. was plainly suffering from addiction in February 2022 when she was denied admission to this program. Roughly one month later, she purchased twenty dollars' worth of methamphetamine and had the child in her care only a day after she consumed this dangerous and illegal drug. These well-established facts fully support the circuit court's finding that A.T. was not "likely to fully participate" in a post-dispositional improvement period.[8] On the facts of this case, waiting *eight months* to begin necessary long-term rehabilitation does not suggest a capacity for future compliance but instead supports the circuit court's finding that A.T. was not likely to fully participate in a post-dispositional improvement period.

---

[8] Although we find that the record supports both the circuit court's findings of fact and its ultimate finding that A.T. was not "likely to fully participate" in a post-dispositional improvement period, we think some of the circuit court's characterizations of the record are unduly harsh. For example, the circuit court found that A.T. "failed to show *any success* in addressing her methamphetamine abuse" and that A.T.'s "*only* effort" to address her methamphetamine addiction was her entry into a long-term rehabilitation facility in April 2022. (Emphasis added.) This is not entirely accurate. While the case was pending, A.T. had numerous negative screens and, among other things, participated in outpatient rehabilitation. A.T.'s problem was not that she failed to demonstrate *any* compliance or progress in her post-adjudicatory improvement period but, rather, that her compliance and progress were marred by significant and demonstrable failures that undermined the circuit court's confidence that she would fully participate in a second, post-dispositional improvement period.

A.T. claims that her delay in participating in long-term rehabilitation should be excused by her tuberculosis infection. However, the circuit court found that she failed to substantiate this excuse, and we do not believe that this finding was clear error. It may be that, for a time, A.T.'s tuberculosis infection posed an impediment to her participation in a long-term rehabilitation program. However, the record indicates that A.T. failed to ensure that the DHHR had timely access to her most relevant medical records—i.e., those from her infectious disease doctor—so that the DHHR could confirm the status of her treatment. A parent in an improvement period has a statutory duty to "execute a release of *all medical information* regarding that respondent, including, but not limited to, information provided by mental health and substance abuse professionals and facilities." W. Va. Code § 49-4-610(4)(B) (emphasis added). Even if the "medical folks" failed to release A.T.'s records, there is no evidence that A.T. sought the court's assistance. *See id.* (requiring "a professional or facility" to accept a respondent parent's release "regardless of whether the release conforms to any standard required by that facility"). Indeed, the record suggests that A.T., herself, resisted the DHHR's efforts to obtain her records and failed to submit to tests that might have allowed her to enter long-term rehabilitation before February 2022, when she was reportedly "cleared" to participate in such programs.

Furthermore, even if we assume that A.T. was ineligible to enter long-term rehabilitation for the entire period between August 2021 and February 2022, A.T. did not enter any other long-term rehabilitation program between the time she was "cleared" in February 2022 and her relapse in March 2022 or before April 12, 2022. By statute, it was

17

A.T.'s responsibility to both *initiate* and *complete* "all terms" of her improvement period. W. Va. Code § 49-4-610(4)(A). Yet A.T. did not *initiate* compliance with the most important term of her prior improvement period until, months after the case had commenced, she suffered a serious relapse. In light of these findings, we believe that the circuit court's findings of fact that A.T. was not likely to fully participate in a second, post-dispositional improvement period and that A.T. failed to substantiate her purported excuse are more than "plausible in light of the record viewed in its entirety." *Tiffany Marie S.*, 196 W. Va. at 226, 470 S.E.2d at 180, syl. pt. 1, in part. Accordingly, we find that A.T.'s motion for a post-dispositional improvement period was properly denied.

### C. Termination of Parental and Custodial Rights.

Finally, A.T. argues that the circuit court erred by terminating her parental and custodial rights. According to her, she was "in treatment" when her rights were terminated and could have completed long-term rehabilitation within statutory timeframes. Additionally, though she acknowledges her "addiction to drugs[,]" she contends that there was "no evidence" that her failure to "respond or follow through with the recommended treatment" was willful. Again, we disagree.

West Virginia Code § 49-4-604(c)(6) (eff. 2020) authorizes a circuit court to "terminate the parental, custodial and guardianship rights and responsibilities of the abusing parent" when the court finds "that there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination is "necessary for the welfare of the child[.]" In this case, the circuit court

18

expressly determined that there was "no reasonable likelihood that the conditions of abuse and neglect [could] be substantially corrected in the near future" and that it was "not in the best interest of the child to delay permanency to monitor whether . . . [A.T. could] address her long-term and severe substance abuse problem[.]" These findings enjoy "substantial deference in the appellate context[,]" and we do not believe that they are clearly erroneous. *Rebecca K.C.*, 213 W. Va. at 235, 579 S.E.2d at 723.

According to applicable law, "'[n]o reasonable likelihood that conditions of neglect or abuse can be substantially corrected' means that, based upon the evidence before the court, the abusing adult or adults have demonstrated an inadequate capacity to solve the problems of abuse or neglect *on their own or with help*." W. Va. Code § 49-4-604(d) (emphasis added). That description captures A.T.'s performance below. Although A.T. acknowledged her abuse of or addiction to drugs in August 2021, she remained, months later and by her own admission, a person who was addicted to drugs and who had used methamphetamine as recently as March 2022. This was not for lack of "help" with her addiction. During this case, A.T. had the benefit of months of drug screens to hold her accountable and the benefit of months of outpatient treatment to address her addiction. Nevertheless, these efforts failed.

Additionally, we agree with the circuit court that, regardless of other statutory timeframes, A.T.'s addiction to drugs was not likely to be "substantially corrected in the *near* future[.]" W. Va. Code § 49-4-604(c)(6) (emphasis added). As of the dispositional hearing in May 2022, A.T. had completed just one month of a nine-month

rehabilitation program, and though by that point A.T. had done well in the program, her short-term success did not overcome the fact that, even with continued success, she would be unable to complete the program in the near future. Moreover, as we have previously stated:

> "[C]ourts are not required to exhaust every speculative possibility of parental improvement . . . where it appears that the welfare of the child will be seriously threatened, and this is particularly applicable to children under the age of three years who are more susceptible to illness, need consistent close interaction with fully committed adults, and are likely to have their emotional and physical development retarded by numerous placements." Syl. Pt. 1, in part, *In re R.J.M.,* 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 4, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011) (alteration in original). Those concerns are particularly relevant when the child, like H.D., is less than one year old at disposition. We agree with the circuit court that H.D.'s best interests would not have been served by waiting months to see whether A.T. could finally overcome her addiction.

In the end, A.T. has established no lawful basis for this Court to disturb the circuit court's termination of her parental and custodial rights or the circuit court's refusal to grant a post-dispositional improvement period or extend her post-adjudicatory improvement period. Indeed, "appellate review is not a device for this Court to replace a [circuit court]'s finding with our own conclusion." *State v. Guthrie*, 194 W. Va. 657, 669, 461 S.E.2d 163, 175 (1995).

## IV. CONCLUSION

For the foregoing reasons, we affirm the circuit court's May 17, 2022 dispositional order.

Affirmed.