# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**In re M.N.**

**No. 24-132** (Mason County 23-JA-39)

**FILED**

**June 6, 2025**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

The petitioner, T.C.,[1] is the maternal grandmother of M.N., the child involved in abuse and neglect proceedings in the Circuit Court of Mason County.[2] The petitioner appeals the circuit court's January 9, 2024, order denying her motion for placement of M.N., arguing that the court erred: 1) when it failed to enforce the DHS's statutory obligation to locate potential kinship and relative placements for M.N. in a timely manner; 2) when it allowed M.N. to remain in a non-relative (foster care) placement after the court became aware of the petitioner's eligibility and willingness to serve as M.N.'s guardian; and 3) when it entered an order denying the petitioner's motion for placement of M.N. and finding that the statutory "grandparent preference" for adoptive placement in West Virginia Code § 49-4-114(a)(3) was overcome by M.N.'s best interests. After considering the parties' written and oral arguments, as well as the record on appeal and applicable law, this Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Shortly after M.N. was born in April 2023, the DHS filed an abuse and neglect petition against M.N.'s mother ("the mother"), an inmate at Lakin Correctional Center, due to the mother's incarceration and the prior termination of her parental rights to two older children. According to the petition, the mother was "unable to provide a family member's name to assist in caring for [M.N.]" Consequently, M.N. was placed with foster parents when she was released from the

---

[1] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

[2] The petitioner appears by counsel Leah Perry Macia. The West Virginia Department of Human Services appears by counsel Attorney General John B. McCuskey and Assistant Attorney General Andrew T. Waight. Because a new Attorney General took office while this appeal was pending, his name has been substituted as counsel. Counsel Tanya Hunt Handley appears as the child's guardian ad litem.

Additionally, pursuant to West Virginia Code § 5F-2-1a, the agency formerly known as the West Virginia Department of Health and Human Resources was terminated. It is now three separate agencies—the Department of Health Facilities, the Department of Health, and the Department of Human Services. *See* W. Va. Code § 5F-1-2. For purposes of abuse and neglect appeals, the agency is now the Department of Human Services ("DHS").

hospital following her birth.[3] At the time of M.N.'s removal, the petitioner, M.N.'s maternal grandmother, was unaware that M.N. had been born due to the petitioner's estrangement from the mother leading up to and during the mother's incarceration. The DHS did not notify the petitioner of M.N.'s need for placement in April 2023; however, the DHS contacted the petitioner by telephone in June 2023, seeking information concerning M.N.'s paternity.[4] After discovering that she had an infant granddaughter in DHS custody, the petitioner requested a home study from the DHS in hopes of securing placement of M.N.

The petitioner faced two preliminary obstacles to home study approval. First, Child Protective Services ("CPS") had investigated the petitioner on two occasions in the past—once in 2004, and once in 2005—and the DHS had substantiated maltreatment findings against the petitioner based on each of these investigations.[5] After requesting a home study for purposes of obtaining placement of M.N., the petitioner filed an administrative grievance contesting both maltreatment substantiations, and in August 2023, the DHS notified the petitioner by letter that the substantiations had been "removed" and that the "findings in the Initial Assessment and Safety Evaluation [of maltreatment would] be changed to maltreatment did not occur." The letter further stated, "As a result, when future background checks are conducted for the purpose of employment, etc. you will not be confronted with a negative finding in West Virginia." Second, the petitioner had been convicted of a felony in the State of New York in 2006 involving distribution of controlled substances. This felony drug conviction initially disqualified the petitioner from home study approval, but the DHS granted the petitioner a "variance" from its disqualification policy in September 2023. Shortly thereafter, the DHS notified the petitioner that her home study had been approved and that she was certified to serve as "a provider of Certified Kinship/Relative foster/adoptive/legal guardianship family care for the [DHS]."

Once her home study was approved, the petitioner sent a letter to the circuit court, "to obtain clarity and information pertaining to [her] granddaughter." In the letter, the petitioner informed the court that her home study had been approved and that she "would greatly appreciate being notified about any court hearing scheduled for [M.N.] and would love to be her foster parent." The court construed the petitioner's letter as a motion to intervene in M.N.'s abuse and neglect case and appointed counsel to represent the petitioner. At an October 2023 hearing, the court granted the petitioner's motion to intervene. The petitioner then moved for placement of M.N., but the DHS and the guardian ad litem opposed the motion. The court declined to rule on the motion during that hearing.

The circuit court conducted an evidentiary hearing on the petitioner's motion for placement in December 2023. At that hearing, the petitioner testified that she had contacted the DHS to

---

[3] M.N. continues to reside with her foster parents. The mother's parental rights to M.N. were ultimately terminated as the result of the abuse and neglect proceedings below.

[4] The DHS later amended the petition to add allegations against M.N.'s father. The father's parental rights were terminated in November 2023.

[5] The record does not contain any information concerning the details of these CPS investigations or the resultant maltreatment substantiations.

2

request custody of her granddaughter, M.N., after learning of her birth. She further testified that she believed it would be in M.N.'s best interests to be placed with her biological family and that M.N. had a large extended family "waiting to meet her." The petitioner testified that M.N. would be loved and properly taken care of if placed with her. The petitioner admitted during cross-examination that she had, on occasion, sent her older daughters to reside with their respective fathers when the petitioner "could not handle them" as children, and she acknowledged that M.N. did not have a father where she could send her if things became difficult. The guardian ad litem introduced a video into evidence showing the petitioner "screaming" at her twelve-year-old daughter and telling the daughter that she was dressed "like a whore." The petitioner testified that the video was not representative of her parenting and claimed that a friend had surreptitiously taken the video and sent it to CPS after the petitioner refused to have a romantic relationship with him. The petitioner further testified that CPS investigated her, based on the video, and made a finding of "no abuse," as memorialized by a DHS letter the petitioner submitted into evidence. Although M.N.'s mother did not testify at this hearing, the petitioner acknowledged, during cross-examination, that M.N.'s mother had opposed placing M.N. with the petitioner and had testified in a previous hearing that the petitioner was abusive toward the mother and the mother's sister when they were children. Next, the father of the petitioner's twelve-year-old daughter testified in support of the petitioner's character and parenting abilities. A CPS worker testified that M.N. was thriving in her foster placement and was bonded with the foster family, noting that M.N. had been with the family for all eight months of her life. A social worker with the foster placement agency testified that she believed continued placement with the foster family was in M.N.'s best interests. The foster mother testified to the strong bond the foster family shared with M.N., as well as the family's desire to adopt M.N.

On January 9, 2024, the circuit court entered an order denying the petitioner's motion for placement of M.N. In its order, the court acknowledged the grandparent preference in West Virginia Code § 49-4-114(a)(3) and cited relevant case law interpreting the statute. The court determined that, notwithstanding the grandparent preference, adoptive placement with the petitioner was contrary to M.N.'s best interests. In support of its decision, the court noted the petitioner's criminal background and past interactions with CPS, including the two removed DHS maltreatment substantiations against the petitioner;[6] the testimony by M.N.'s mother that the petitioner was abusive toward her and her sister when they were children; and the petitioner's apparent "inability to care for her daughters without the assistance of their fathers[,]" considering that there was no father with whom M.N. could reside "should [the petitioner] be overwhelmed and unable to cope, as occurred with her own daughters." The court further noted that M.N. was thriving in her foster placement and concluded that, "after reviewing the file and listening to the arguments of counsel, and considering the entirety of the record before it, [the court could not] find that a grandparental adoption [was] in [M.N.'s] best interests." It is from this order that the petitioner now appeals.

On appeal from a final order in an abuse and neglect proceeding, "[t]his Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We

---

[6] The court expressed concern over the fact that the DHS had removed the petitioner's maltreatment substantiations nearly two decades after they were made, without providing any explanation for the removal.

review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo.*" Syl. Pt. 1, in part, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (2005). With these standards in mind, we consider the parties' arguments.

The petitioner argues first that the DHS failed to locate potential relative and kinship placements for M.N. in the days following her removal, as required by West Virginia Code § 49-4-601a, which provides:

> When a child is removed from his or her home, placement preference is to be given to relatives or fictive kin of the child. If a child requires out-of-home care, placement of a child with a relative is the least restrictive alternative living arrangement. The department *must diligently search for relatives of the child and fictive kin within the first days of a child's removal and must identify and provide notice of the child's need for a placement to relatives and fictive kin who are willing to act as a foster or kinship parent.*

(Emphasis added). The statute also requires the DHS to submit certain filings to the circuit court to demonstrate compliance. No later than seven days after filing the petition for removal, the DHS must file a list of all relatives and fictive kin known to the DHS, whether or not such persons have expressed willingness to take custody of the removed child. *Id.* Then, no later than forty-five days after the filing of the petition for removal, the DHS must file a list of all relatives and fictive kin who are willing and able to act as foster or kinship parents to the removed child. *Id.* The petitioner points out that the DHS did not file either list with the court, and at no time did the DHS notify the petitioner of her granddaughter's removal or need for placement. The petitioner casts doubt on the level of diligence the DHS applied in searching for M.N.'s relatives and fictive kin in the days following her removal in April 2023, stressing that the DHS was able to locate and contact the petitioner when trying to identify M.N.'s father in June 2023. The petitioner contends that the court erred by failing to enforce the requirements of West Virginia Code § 49-4-601a.

In response, the DHS asserts that it complied with the requirements of West Virginia Code § 49-4-601a "in function, if not in form" by virtue of the information included in the abuse and neglect petition and the family case plan that it filed with the circuit court in July 2023. The petition indicated that the mother "was unable to provide a family member's name to assist in caring for her infant child," and the DHS left blank the section of the July 2023 family case plan where it would typically list potential relative placements. The DHS avers that its omission from the family case plan "made sense[,] given the lack of maternal family members [the mother] named."

We find the DHS's argument that it complied with West Virginia Code § 49-4-601a "in function" unpersuasive. The DHS did not submit the statutorily required lists of potential relative and kinship placements to the circuit court, and it would strain credulity to conclude that the DHS performed a "diligent" search for M.N.'s relatives and fictive kin in the days following her removal. As the petitioner points out, the DHS failed to notify the petitioner of M.N.'s removal yet succeeded in locating and contacting the petitioner just slightly over a month later when investigating M.N.'s paternity. Even after the DHS contacted the petitioner in June 2023 and was, thus, demonstrably aware that M.N. had a maternal grandmother who was willing to adopt her, the DHS did not mention the petitioner in the July 2023 family case plan it filed with the court. Instead, the DHS left blank the relevant section of the case plan—a section that specifically instructed the

4

DHS to "[i]dentify relatives or friends, including those who live out of state, who were contacted regarding the possibility of placement, reasons that the child was not placed with them or explain why no relatives or friends were contacted. **RULE 28 (c)(2)**[.]"[7] (emphasis in original). It was not until the petitioner took it upon herself to write to the court directly that the court became aware of the petitioner's willingness and eligibility to serve as M.N.'s guardian. We therefore conclude that the DHS did not comply with West Virginia Code § 49-4-601a, either in form *or* in function.

This Court has not previously addressed whether, or under what circumstances, the DHS's failure to comply with West Virginia Code § 49-4-601a may be imputed to the circuit court as error. We decline to do so now, because even assuming (arguendo) that the circuit court should have ordered the DHS to comply with the statute, any error in its failure to do so was harmless.[8] At the time of M.N.'s birth and removal, the petitioner was not eligible to serve as M.N.'s guardian under the DHS's policies. In her September 2023 letter to the court, the petitioner stated that she had "submitted an application to become [M.N.'s] foster parent immediately after finding out about [M.N.'s birth]" in June 2023. On August 15, 2023, the DHS informed the petitioner that she was ineligible to serve as a relative guardian due to her disqualifying criminal background. Although the DHS ultimately granted the petitioner a "variance" from its disqualification policy, the petitioner did not receive notice of the variance until September 7, 2023—around three months after the petitioner commenced her efforts to serve as M.N.'s guardian. Additionally, the petitioner had two maltreatment substantiations on her record until August 2023. Even if the DHS had contacted the petitioner immediately after M.N.'s removal, the petitioner was not eligible to serve as M.N.'s guardian at that time.[9] Moreover, the DHS's failure to contact the petitioner following M.N.'s removal did not prevent the petitioner from intervening in the case or from being considered as a potential adoptive parent for M.N. Under the particular circumstances of this case, any error occasioned by the DHS's failure to comply with West Virginia Code § 49-4-601a was harmless and affords the petitioner no relief.[10]

Next, the petitioner argues that it was error for the circuit court to allow M.N. to remain in a more restrictive, non-kinship placement pending the disposition of the mother's parental rights

---

[7] Indeed, when the DHS recommends placement of a child outside of the home, Rule 28(c)(2) of the Rules of Procedure for Child Abuse and Neglect Proceedings also requires the DHS to identify the "relatives or friends who were contacted about providing a suitable and safe permanent placement for the child" in the case plan.

[8] This Court has recognized that "[m]ost errors, including constitutional ones are subject to harmless error analysis." *State ex rel. Waldron v. Scott*, 222 W. Va. 122, 126, 663 S.E.2d 576, 580 (2008) (citation omitted).

[9] We further note that the circuit court could not have been on notice of the DHS's failure to search for relatives and kin until the deadlines for the court filings required by West Virginia Code § 49-4-601a had passed.

[10] We caution the DHS and the circuit courts that the requirements of West Virginia Code § 49-4-601a are mandatory and, under a different set of facts, similar noncompliance may result in prejudicial error.

after the DHS approved the petitioner's home study. As discussed in detail above, West Virginia Code § 49-4-601a creates a preference for placement with a relative or fictive kin following a child's removal, and, as discussed in detail below, West Virginia Code § 49-4-114(a)(3) creates a "grandparent preference" for the final adoptive placement of a child. However, the petitioner does not offer any authority to support her assertion that the court was required to transfer M.N. from an established foster care placement to a newly discovered (and newly qualified) relative placement pending disposition of the case. Since the petitioner's second assignment of error is unsupported by legal authority, we decline to address it further.[11]

Finally, the petitioner asserts that the circuit court erred when it issued its January 9, 2024, order denying her motion for placement of M.N. The petitioner argues that the court improperly relied upon the petitioner's removed DHS maltreatment substantiations and other grounds that the petitioner contends were insufficient to overcome the statutory grandparent preference for adoptive placement. The DHS counters that the court properly found that M.N.'s interests were best served by remaining with her foster parents.

The petitioner is correct that West Virginia Code § 49-4-114(a)(3) "provides for grandparent preference in determining adoptive placement for a child where parental rights have been terminated." *See Napoleon S.*, 217 W. Va. at 256, 617 S.E.2d at 803, Syl. Pt. 4. The grandparent preference derives from the following statutory language:

> (3) For purposes of any placement of a child for adoption by the department, the department shall first consider the suitability and willingness of any known grandparent or grandparents to adopt the child. Once grandparents who are interested in adopting the child have been identified, the department shall conduct a home study evaluation, including home visits and individual interviews by a licensed social worker. If the department determines, based on the home study evaluation, that the grandparents would be suitable adoptive parents, it shall assure that the grandparents are offered the placement of the child prior to the consideration of any other prospective adoptive parents. A circuit judge may determine the placement of a child for adoption by a grandparent or grandparents is in the best interest of the child without the grandparent or grandparents completing or passing a home study evaluation.

West Virginia Code § 49-4-114(a)(3). This Court has expounded on the grandparent preference, holding that "[t]he statute contemplates that placement with grandparents is presumptively in the best interests of the child, and the preference for grandparent placement may be overcome only where the record reviewed in its entirety establishes that such placement is not in the best interests

---

[11] *See State v. White*, 228 W. Va. 530, 541 n.9, 722 S.E.2d 566, 577 n.9 (2011) ("Typically, this Court will not address issues that have not been properly briefed.") (citation omitted); *see also State v. LaRock*, 196 W. Va. 294, 302, 470 S.E.2d 613, 621 (1996) ("Although we liberally construe briefs in determining issues presented for review, issues which are . . . mentioned only in passing but are not supported with pertinent authority[] are not considered on appeal.") (citation omitted).

of the child." *Napoleon S.*, 217 W. Va. at 256, 617 S.E.2d at 803, Syl. Pt. 4, in part. However, this Court has also explained that "[t]he grandparent preference must be considered in conjunction with our [long-standing] jurisprudence that the primary goal in cases involving abuse and neglect . . . must be the health and welfare of the children." *In re Hunter H.*, 227 W. Va. 699, 703, 715 S.E.2d 397, 401 (2011) (internal quotation marks and citation omitted). To that end, this Court has cautioned that "[t]he preference is just that—a preference. It is not absolute." *In re K.E.*, 240 W. Va. 220, 225, 809 S.E.2d 531, 536 (2018).

In its January 9, 2024, order, the circuit court adopted detailed findings of fact and conclusions of law demonstrating that the court considered the grandparent preference in West Virginia Code § 49-4-114(a)(3), but determined, based on the record in its entirety, that placement with the petitioner would be contrary to M.N.'s best interests. The court based its decision in this case on numerous factors. Specifically, the court noted its concerns with the petitioner's criminal background, the petitioner's history of sending her children to live with their fathers when she "could not handle" them, testimony that the petitioner was physically and emotionally abusive to M.N.'s mother and aunt when they were children, and testimony that M.N. was thriving in her foster placement and had bonded with the foster family.

We have emphasized many times that, "a circuit court's substantive determinations in abuse and neglect cases on adjudicative and dispositional matters . . . [are] entitled to substantial deference in the appellate context." *In re J.C.*, 232 W. Va. 81, 87, 750 S.E.2d 634, 640 (2013) (citation omitted). On appeal, this Court "may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety. Syl. Pt. 1, in part, *In Int. of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996). In the instant case, the evidence supported the court's findings of fact and conclusions of law in its January 9, 2024, order. Therefore, we conclude that the circuit court did not abuse its discretion in denying the petitioner's motion for placement of M.N.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** June 6, 2025.

**CONCURRED IN BY:**

Chief Justice William R. Wooton
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice C. Haley Bunn

**DISSENTING:**

Justice Charles S. Trump IV

7

Trump, Justice, dissenting:


Respectfully, I dissent from the majority's decision in this case. I applaud the circuit court's decision to appoint counsel to represent the petitioner ("the grandmother") and to permit her to intervene in the case after the DHS attempted to completely prevent her from being considered as an adoptive placement for her granddaughter, M.N. However, I believe that the circuit court erred when it failed to enforce the DHS's duties under West Virginia Code § 49-4-601a and when it afforded evidentiary weight to the grandmother's removed DHS maltreatment substantiations in rendering its January 9, 2024, order ("permanency order"). Accordingly, I would vacate the permanency order and remand this case to the circuit court with instructions to enter a new permanency order consistent with the legal analysis set forth below.

## A. Applicable Statutory Preferences

This Court has long held that "[i]n a contest involving the custody of an infant[,] the welfare of the child is the polar star by which the discretion of the court will be guided." Syl. Pt. 2, *State ex rel. Lipscomb v. Joplin*, 131 W. Va. 302, 47 S.E.2d 221 (1948).[1] Recognizing the love and natural bond that exists between grandparents and their grandchildren, in 1997, the West Virginia Legislature adopted a statutory preference that children removed from their homes in abuse and neglect proceedings be placed for adoption with suitable grandparents. *See* W. Va. Code § 49-4-114(a)(3) ("grandparent placement preference").[2] This Court has specifically addressed the circuit court's duty to apply the grandparent placement preference at the permanency stage of abuse and neglect proceedings, holding that "[t]he [grandparent preference] statute contemplates that *placement with [suitable] grandparents is presumptively in the best interests of the child*, and the preference for grandparent placement may be overcome only where the record reviewed in its entirety establishes that such placement is not in the best interests of the child." Syl. Pt. 4, in part, *Napoleon S. v. Walker*, 217 W. Va. 254, 617 S.E.2d 801 (emphasis added).[3]

---

[1] *See also* Syl. Pt. 5, in part, *Carter v. Carter*, 196 W. Va. 239, 470 S.E.2d 193 (1996) ("In . . . custody matters, we have traditionally held paramount the best interests of the child."); Syl. Pt. 3, in part, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996) ("[T]he primary goal in cases involving abuse and neglect . . . must be the health and welfare of the children.").

[2] The grandparent placement preference originally appeared in West Virginia Code § 49-3-1 but was relocated to its current location in West Virginia Code § 49-4-114 in 2015, when the Legislature reorganized and renumbered all statutory provisions on child welfare. *See* 2015 W. Va. Acts Ch. 46 (H.B. 2200).

[3] *Accord* Syl. Pt. 2, *State ex rel. D.B. v. Bedell*, 246 W. Va. 570, 874 S.E.2d 682 (2022); Syl. Pt. 8, *In re A.A.*, 246 W. Va. 596, 874 S.E.2d 708 (2022); Syl. Pt. 2, *In re J.P.*, 243 W. Va. 394, 844 S.E.2d 165 (2020); Syl. Pt. 7, *In re P.F.*, 243 W. Va. 569, 848 S.E.2d 826 (2020); *In re L.M.*, 235 W. Va. 436, 445, 774 S.E.2d 517, 526 (2015); Syl. Pt. 2, *In re Hunter H.*, 227 W. Va. 699, 715 S.E.2d 397 (2011) (per curiam); Syl. Pt. 2, *In re Aaron H.*, 229 W. Va. 677, 735 S.E.2d 274 (2012); Syl. Pt. 2, *In re Elizabeth F.*, 225 W. Va. 780, 696 S.E.2d 296 (2010) (per curiam).

Our law thus presumes that once parental rights to a child have been terminated, adoptive placement with a suitable grandparent is in the best interests of the child. To that end, West Virginia Code § 49-4-114(a)(3) provides that "[o]nce grandparents who are interested in adopting the child have been identified, the department shall conduct a home study evaluation, including home visits and individual interviews by a licensed social worker." The statute further provides that "once the department determines, *based on the home study evaluation*, that the grandparents would be suitable adoptive parents" the DHS "*shall assure* that the grandparents are offered the placement of the child prior to the consideration of any other prospective adoptive parents." *Id.* (emphasis added). This Court has explained that the home study process allows the DHS and the circuit court to ensure that placement with a grandparent is, in fact, consistent with the best interests of the child:

> "By specifying in West Virginia Code § [49-4-114(a)(3)] that the home study must show that the grandparents 'would be suitable adoptive parents,' the Legislature has implicitly included the requirement for an analysis by [the DHS] and circuit courts of the best interests of the child, given all circumstances of the case."

*Napoleon S.*, 217 W. Va. at 256, 617 S.E.2d at 803, Syl. Pt. 5.

In addition to the grandparent placement preference, our law creates a preference for a child's initial placement following removal in an abuse and neglect case with the child's relatives or fictive kin. *See* W. Va. Code § 49-4-601a ("initial placement preference"). The majority opinion explains how the initial placement preference requires the DHS to "diligently search for relatives of the child and fictive kin within the first days of a child's removal[,] [to] identify and provide notice of the child's need for a placement to relatives and fictive kin who are willing to act as a foster or kinship parent[,]" and to submit certain lists of potential relative and fictive kin placements to the circuit court. *Id*. First, the DHS must file a list of all known relatives and fictive kin of the child with the circuit court no later than seven days after filing the petition for removal of the child. *Id.* Second, the DHS must file a list of all relatives and fictive kin of the child who are willing and able to act as foster or kinship parents no later than forty-five days after the filing of the petition for removal. *Id.*

The initial placement preference appears in a separate section of the West Virginia Code from the grandparent placement preference, and the initial placement preference applies to a child's placement with all manner of relatives and fictive kin, not just with grandparents. Yet, these two requirements, while distinct, are interrelated in practice. As exemplified in this case, circuit courts often weigh the emotional bond that develops between foster parents and a foster child over the course of abuse and neglect proceedings (or conversely, the lack of or dissolution of a bond between grandparents and the child over the same period) against the grandparent placement preference when rendering a permanency decision at the conclusion of a case.[4] Therefore, when

---

[4] *See e.g. In re A.H.*, No. 23-669, 2025 WL 1397102, at \*4 (W. Va. May 14, 2025) (memorandum decision); *In re L.T.*, No. 24-29, 2025 WL 1378121, at \*2 (W. Va. May 13, 2025) (memorandum decision); *In re G.H.*, No. 23-736, 2024 WL 4684015, at \*2 (W. Va. Nov. 6, 2024) (memorandum decision); *In re S.M.*, No. 22-0504, 2023 WL 3071353, at \*1 (W. Va. Apr. 25, 2023) (memorandum decision); *In re A.H.*, No. 21-0053, 2021 WL 5371414, at \*4 (W. Va. Nov.

the DHS fails to comply with the initial placement preference, it inevitably diminishes the likelihood of adoptive placement with a grandparent at the conclusion of abuse and neglect proceedings.

## B. DHS Noncompliance

The DHS undermined the grandparent placement preference at every stage of this case, beginning with its failure to comply with West Virginia Code § 49-4-601a. The DHS was not "diligent" in its search for potential relative and kinship placements for M.N. in the days following her removal in April 2023. Notably, the DHS was perfectly able to locate the grandmother when investigating M.N.'s paternity in June 2023. Unlike the majority, I would find that the circuit court erred when it failed to enforce the requirements of West Virginia Code § 49-4-601a and Rule 28(c)(2) of the Rules of Procedure for Child Abuse and Neglect Proceedings and I would not conclude that such error was harmless.

The circuit court was surely on notice that the DHS failed to comply with West Virginia Code § 49-4-601a and Rule 28(c)(2) in this case. The DHS did not file the two statutorily required lists of potential relative and fictive kin placements by the applicable deadlines, which would have fallen in April 2023 and June 2023, respectively. The DHS's disregard of the law appeared to be more than a mere oversight. The DHS left blank the relevant section of the family case plan form that it filed in July 2023, which instructed the DHS to "[i]dentify relatives or friends, including those who live out of state, who were contacted regarding the possibility of placement, reasons that the child was not placed with them *or explain why no relatives or friends were contacted.* **RULE 28 (c)(2)**[.]" (first emphasis added) (second emphasis in original). I believe it was incumbent upon the circuit court to order the DHS to comply with its duties, to ensure that "the Rules of Procedure for Child Abuse and Neglect Proceedings and related statutes for the disposition of cases involving children adjudicated to be abused or neglected" were not "substantially disregarded or frustrated" in this case. *See* Syl. Pt. 5, *In re Edward B.*, 210 W. Va. 621, 558 S.E.2d 620 (2001).

To that end, I would hold that a circuit court must order the DHS to submit all filings required by West Virginia Code § 49-4-601a and Rule 28(c)(2) when the DHS fails to do so by the deadlines specified therein, and that a circuit court's failure to compel DHS compliance with those requirements is error. This Court has seen time and time again how the bond that develops between foster parents and a child during the pendency of an abuse and neglect case is routinely weighed against the grandparent placement preference at the permanency stage of proceedings. In this case, there is simply no telling how the grandmother's earlier involvement in the proceedings might have impacted the initial placement decision, the circuit court's openness to granting visitation rights (and the ability for the grandmother to form her own bond with M.N.), or the circuit court's final permanency order.

The record before us makes clear that, but for the grandmother's diligent efforts to gain custody of her infant granddaughter, the circuit court might never even have learned that M.N. had a grandmother, much less one who was willing, able, and eager to take her in. The record reflects

18, 2021) (memorandum decision); *In re A.J.*, No. 21-0276, 2021 WL 4938157, at *4 (W. Va. Oct. 13, 2021) (memorandum decision); *In re B.F.*, No. 19-0825, 2020 WL 2043358, at *2 (W. Va. Apr. 28, 2020) (memorandum decision).

that after repeatedly calling the DHS case worker to find out about the status of her granddaughter and the status of the home study that she had requested, the grandmother became frustrated by the lack of any response to the point that she took it upon herself to write a letter directly to the circuit judge, inquiring about her granddaughter. To the circuit court's credit, the court treated the grandmother's letter as a motion to intervene and granted the motion, mitigating any further harm that may have resulted from the DHS's failure to comply with West Virginia Code § 49-4-601a and Rule 28(c)(2).

### C. Maltreatment Substantiations

As described in greater detail below, I would also find that it was improper for the circuit court to consider the grandmother's removed DHS maltreatment substantiations in determining that the grandparent placement preference had been overcome in this case. The statutory and administrative requirements governing maltreatment substantiations have changed significantly in recent years, warranting a brief overview of how these changes should have informed the circuit court's determination in this case.

The DHS has been adopting so-called "maltreatment substantiations" against individuals for decades.[5] A "maltreatment substantiation" describes a finding, by a single DHS worker, that an individual has abused or neglected a child.[6] Prior to 2020, including when the DHS "substantiated" maltreatment findings against the grandmother in 2004 and 2005, there was no legal definition of the term "maltreatment substantiation," no statutory process by which an individual could challenge or refute a "maltreatment substantiation," and no requirement that a person against whom the DHS adopted a "maltreatment substantiation" would ever even receive notice of the "substantiation." A "maltreatment substantiation" was a secret scarlet letter, imposed at the discretion of a single DHS employee. Even where the allegations underlying a "maltreatment substantiation" led to an abuse and neglect case or criminal case, a substantiation would be maintained within a DHS registry whether *or not* the case resulted in a judicial finding of abuse and neglect. To this day, inclusion on this DHS substantiation registry generally disqualifies individuals from working in certain caregiver jobs or from being certified as foster or adoptive

---

[5] While it is unclear when the DHS created the "maltreatment substantiation" process, the record of this case makes clear that the DHS was substantiating maltreatment allegations against individuals at least as early as 2004.

[6] Following the Legislature's enactment of West Virginia Code § 49-4-601b, the DHS promulgated legislative rules which define a "maltreatment substantiation" as a

> determination by *a* child protective service worker or IIU [Institutional Investigative Unit] worker that the parent, guardian, or custodian has abused or neglected a child as defined in W. Va. Code § 49-1-201. Maltreatment is considered to have occurred when a preponderance of the credible evidence indicates that the conduct of the parent, guardian, or custodian is child abuse or neglect, or both.

W. Va. C.S.R. § 78-27-2 (emphasis added). Prior to this time, there was no legal definition of the term.

11

parents by the DHS, including individuals who have never been adjudicated, or even named, as a respondent in an abuse or neglect petition or charged with a crime involving abuse or neglect. Like the grandmother in this case, many individuals added to the DHS substantiation registry prior to 2020 likely have no idea that they have been branded by the DHS as perpetrators of child abuse or neglect.[7]

During the Regular Session of the West Virginia Legislature in 2020, the Legislature adopted West Virginia Code § 49-4-601b, which, for the first time, extended a level of due process to individuals against whom the DHS has substantiated a maltreatment finding.[8] The statute now requires the DHS to provide an individual with notice of a DHS maltreatment substantiation against him or her, the details of the allegations underlying the substantiation, and whether the substantiation will result in the individual's inclusion on any DHS registry. The DHS must further notify the individual of his or her right to contest and appeal a substantiation and "that inclusion…on the [DHS substantiation] registry may prevent the person from holding jobs from which child abusers are disqualified, *or from providing foster or kinship care to a child in the future*[.]" *Id.* (emphasis added). By creating this administrative grievance and appeal process, the Legislature provided a mechanism by which an individual has a meaningful opportunity to challenge a determination *by a single CPS or IIU worker* that could have serious, lifetime consequences for the individual.

### D. Abuse of Discretion

In light of the statutory right to contest a DHS maltreatment substantiation and the attendant statutory notice requirements, it would create an absurd result for the circuit courts to weigh maltreatment substantiations that have been removed, vacated, or otherwise reversed pursuant to a successful administrative grievance against the grandparent placement preference. While a circuit court has wide latitude to consider the entire record in an abuse and neglect case, the Legislature has specifically empowered and directed the DHS to operate and maintain a process for individuals to challenge maltreatment substantiations. Here, the circuit court encroached upon the statutory authority of the DHS to decide administrative grievances, pursuant to West Virginia Code § 49-4-601b, when it second guessed "the validity of the Department's modification of its nearly two decades old finding of maltreatment." This Court has explained, generally, "when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed but the circuit court makes a serious mistake in weighing them" the court abuses its discretion. *Shafer v. Kings Tire Serv., Inc.*, 215 W.Va. 169, 177, 597 S.E.2d 302, 310 (2004) (internal quotation marks and citation omitted). Accordingly, I would find that the circuit court abused its discretion when it afforded evidentiary weight to the maltreatment substantiations that the DHS had removed, pursuant to the grandmother's successful DHS grievance, when determining whether the grandparent placement preference had been overcome in this case and when rendering its permanency order.

---

[7] Again, the petitioner testified that she had no idea that the DHS substantiated abuse or neglect findings against her in 2004 and 2005, and that she only became aware of her inclusion on the DHS registry after attempting to gain custody of M.N.

[8] These protections only apply when the underlying allegations do not result in a judicial determination or adjudication of abuse and neglect.

Furthermore, I do not believe that the circuit court's abuse of discretion was harmless. When viewing the circuit court's factual findings in its January 2024 order, as a whole, the court devoted two lengthy paragraphs to describing the removed maltreatment substantiations. Unlike the majority, I cannot conclude that the other factors the circuit court considered and weighed in rendering its decision would have been sufficient to overcome the grandparent placement preference had the court not improperly considered the removed maltreatment substantiations.

In its permanency order, the circuit court considered the fact that the grandmother has a criminal record. She was convicted of a drug offense in New York in 2006, which the court referred to as "an old criminal history . . . [that did] not give rise to any concern or raise any objection [by the DHS,]" in its November 2023 order granting the grandmother's petition to intervene. This isolated conviction, which occurred decades ago, did not disqualify the grandmother from fostering or adopting M.N. In fact, the DHS's Home Finding Unit was aware of the grandmother's 2006 conviction but determined, nonetheless, that the grandmother would be a suitable adoptive parent for M.N. Although the grandmother's conviction initially disqualified her from home study approval, the DHS granted the grandmother a "variance" from its disqualification policy. Shortly thereafter, the DHS notified the petitioner that her home study had been approved and that she was certified to serve as "a provider of Certified Kinship/Relative foster/adoptive/legal guardianship family care for the [DHS]." The letter contained documentation specifically stating that, at that time, the grandmother met "all requirements by [the DHS's] Home Finding Unit to be approved as a Certified Kinship/Relative/Foster/Adoptive/Legal Guardianship provider for her maternal granddaughter, [M.N.]."

The circuit court also cited, in its permanency order, the grandmother's "history with CPS." Apart from the removed maltreatment substantiations, this statement could only refer to a video submitted into evidence by the guardian ad litem, which showed the grandmother yelling at her twelve-year-old daughter. The CPS investigated the video, as well as the argument recorded on it, and made an official finding of "no abuse." And while the circuit court also expressed concern over the petitioner's history of sending her daughters to stay with their fathers when she was "overwhelmed and unable to cope" with them, it is difficult to imagine that the court could have afforded any significant weight to this factor. The fact that a mother has occasionally called upon her children's fathers to participate in their upbringing is hardly an indictment of her parenting abilities. In its permanency order, the circuit court also noted M.N.'s mother's allegations, during an earlier proceeding, that the grandmother had been emotionally abusive to the mother and her sister when they were children. It seems unlikely that the circuit court could have given significant credit to the mother's testimony, considering the mother's own extensive CPS history and long-term substance abuse. And finally, while the circuit court noted that M.N. had bonded with her foster parents, this Court has found that "[i]t is unreasonable to contend that the absence of bonding should be a legitimate basis for denying the grandparents an opportunity to adopt when the court system itself [has] eliminated any potential for bonding[.]" *Napoleon S.*, 217 W. Va. at 262, 617 S.E.2d at 809. The same reasoning applies when DHS misconduct eliminates the potential for bonding between a removed child and their grandparent.

In addressing each of the factors above, I do not intend to reweigh the evidence before the circuit court but rather to explain why I believe that the court would not have reached the same decision in its permanency order had it not improperly considered the grandmother's removed maltreatment substantiations. It seems unlikely to me that the remaining evidence would have been

sufficient for the circuit court to find that the grandparent placement preference required by our law had been overcome in this case, and thus, I cannot conclude that the court's error was harmless.

## E. Conclusion

In my opinion, the conduct by the DHS and the errors of the lower court in this case deprived the child, M.N., of the opportunity to be reared by a grandmother who has been eager from the moment that she learned of her granddaughter's birth to take her in and care for her. For the reasons stated above, I dissent. I would vacate the circuit court's permanency order and remand this case to the circuit court with instructions to enter a new permanency order consistent with the principles, statutes, and cases discussed above.